# United States District Court
# Wisconsin Eastern District at the Milwaukee Division

Pablito Vega
Petitioner

**CIVIL CASE: 23-CV-1357**

Vs.

Community Development Financial Institution
Local Initiatives Support Corporation Milwaukee Office
RESPONDENT I



&

Community Development Financial Institution
Milwaukee Economic Development Corporation
RESPONDENT II

## PETITIONER VEGA'S REPLY TO DENY MEDCs MOTION TO DISMISS OF 15 DECEMBER 2023

Petitioner Vega certainly had a right to make contact with both of these so called Community Development Financial Institutions to ascertain the manner in which the economic resources in question delegated to them by the State of Wisconsin were being dispersed to qualified small businesses in the census tracts located in 53204 or 53202. Petitioner Vega had an absolute right to request and apply for these economic resources that were intended originally to be awarded to particular small businesses that met the criteria qualifications noted in the Award Agreement between the State of Wisconsin Department of Administration and both of these so-called Community Development Financial Institutions. The Petitioner Vega was obviously both a prospective applicant and an actual applicant because he requested access to this credit that he was denied to by being told a falsehood that both organizations did not have on hand any of these economic resources to disperse in Quarter 4 2022. Partitioner Vega was obviously discouraged by both of these organizations to not pursue any further ARPA economic resources by their devious actions in refusing to admit that they in fact had on hand $8.3 million dollars allocated to them by the State of Wisconsin Department of Administration in April 2022 because he had no entitlement to them under any standard.

476 F.Supp. 758 (1979), Lois OWENS, A/K/A Lois Williams and Betty J. Maddock v. MAGEE FINANCE SERVICE OF BOGALUSA, INC., Civ. A. No. 77-3151, United States District Court, E. D. Louisiana, 13 August 1979

A.) "Plaintiff Maddock claims a violation by Magee of her rights under the Equal Credit Opportunity Act, specifically 15 U.S.C. § 1691(a)(3), which provides:
It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction —
    (3) because the applicant has in good faith exercised any right under this chapter."

B.) "Maddock fit the statutory basis for setting forth a claim under § 1691(a)(3) since she was an 'applicant,' 12 C.F.R. § 202.3(c), who made application for a direct loan (credit), 12 C.F.R. § 202.3(h), from Magee, who was a 'creditor,' 12 C.F.R. § 202.3(j), under the definition of Regulation 'B' with regard to a 'credit transaction,' 12 C.F.R. § 202.3(k). In evaluating Maddock's creditworthiness, Magee took into account a prohibited basis —her exercise of rights under the Truth-in-Lending Act."

C.) "Even if this Court were to believe the evidence offered by Magee that it was not requiring the signing of the settlement document as a condition of the creditworthiness of Maddock (a factual finding that this Court cannot legitimately make from the facts and circumstances presented to the Court) plaintiff Maddock's reasonable *feeling* that this was the basis upon which she was being granted the emergency loan would alone compel this Court to make a finding on her behalf since under 12 C.F.R. § 202.5(a), Magee would have violated her rights and evaluated her application on a prohibited basis by making an oral statement to an applicant that would discourage on a prohibited basis a reasonable person from making or pursuing an application."

It cannot be disputed by anybody at the LISC or MEDC that the $8.3 million that were dispersed to those organizations by the Wisconsin Department of Administration via the American Rescue Plan Act was a special purpose credit program design to assist small businesses recovering from the COVID-19 Pandemic that are located within certain census tracts and ZIP CODE 53202 and ZIP CODE 53204 among other Zip Codes throughout the State of Wisconsin. Vega Global Advisors was such a qualified entity in that it was a small business located within census tracts in 53202 and 53204 that met all the qualifications to not only being considered for such a economic resource but to be awarded a grant of some fashion or a forgivable loan as intended not only in the language used by the State of Wisconsin Department of Administration but also the language contained within the Award Agreement between the State of Wisconsin Department of Administration and LISC or MEDC. There is no question that the $8.3 million served as a special purpose credit program to assist qualified small businesses and not just any other consumer seeking a loan who did not have any sort of affiliation with a private startup or business of their own.

743 F.2d 169 (1984), UNITED STATES of America, Appellee, v. AMERICAN FUTURE SYSTEMS, INC., First National Acceptance Corporation and Edward M. Satell, President of American Future Systems, Inc., Appellants, No. 83-1766, United States Court of Appeals, Third Circuit, Argued June 18, 1984, Decided September 5, 1984, Rehearing Denied October 2, 1984, As Amended October 10, 1984

A.) "The Equal Credit Opportunity Act proscribes discrimination in the extension of credit. Section 1691(a) of the ECOA states that

> [i]t shall be unlawful for any creditor[[3]] to discriminate against any applicant, with respect to any aspect of a credit transaction — (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract).[[4]]

(Citing Footnote 3: '15 U.S.C. § 1691a(e) defines a creditor as "any person who regularly extends, renews or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit."')

(Citing Footnote 4: 'The ECOA was originally passed in 1974 to prohibit credit discrimination on the grounds of sex and marital status. The Act was amended in 1976 to prohibit as well credit discrimination on the basis of race, color, religion, national origin and age. 15 U.S.C. § 1691(a)(1). The 1976 Amendments also included the exemption for special purpose credit programs.') 15 U.S.C. § 1691(c)(3)

The ECOA does provide, however, for special purpose credit programs responsive to special social needs of a class of persons. Section 1691(c)(3) carves out this exception:
> It is not a violation of this section for a creditor to refuse to extend credit offered pursuant to ... any special purpose credit program offered by a profit-making organization to meet special social needs which meets standards prescribed in regulations by the [Federal Reserve] Board."

B.) "The Joint Conference Committee on the 1976 amendments explained the intent of special purpose credit programs and the circumstances under which special purpose programs would be permitted. The intent of [the special purpose credit program language] of the statute is to authorize the [Federal Reserve] Board to specify standards for the exemption of classes of transactions when it has been clearly demonstrated on the public record that *without such exemption the consumers involved would effectively be denied credit*. As in the case of Government sponsored or non-profit programs, *this provision is intended to confirm that ongoing special programs offered by commercial creditors are not automatically violative of this Act.*" H.R.Rep. No. 873, 94th Cong., 2d Sess. 8, *reprinted in* 1976 *U.S.Code Cong. & Ad. News* 403, 428 (emphasis added)

C.) "The Senate Subcommittee also gave examples of the sort of special purpose credit programs that were contemplated by this exemption.

> The essential prohibition in this legislation is directed at discrimination 'against' applicants. *Nothing in this section should be read to bar* ... experimental or ongoing special programs which prefer applicants in certain categories so long as there is no accompanying restriction of credit available to applicants not in those categories. *For example, this Act is not intended to prohibit positive credit programs aimed at the 'young adults' or 'golden age' accounts.*" S.Rep. No. 589, 94th Cong., 2d Sess. 5-6, *reprinted in* 1976 *U.S.Code Cong. & Ad. News* 403, 407 (emphasis added)

D.) "The Federal Reserve Board limits the special purpose credit program exception in Regulation B, which states that a program:

> shall qualify as a special purpose credit program under paragraph (a) of this section *only* if it was established and is administered so as not to *discriminate against an applicant* on the basis of race, color, religion, national origin, sex, marital status, age ..., [or] income derived from a public assistance program, ... except that all program participants may be required to share one or more of those characteristics so long as the program was not established and is not administered with the purpose of evading the requirements of the Act or this part." 12 C.F.R. § 202.8(b)(2) (1984) (emphasis added)

E.) "The ECOA sets forth general guidelines which must be satisfied in order for a credit program to qualify as 'special' under the Act. A special purpose credit program must 'meet special social needs,' 12 C.F.R. § 202.8(a)(3) (1984); a program meets this requirement when it is

> established and administered to extend credit to a class of persons who, ... (under the credit agencies' customary standards) probably would not receive such credit or probably would receive it on less favorable terms." 12 C.F.R. § 202.8(a)(3)(ii)

F.) "'Because one of the purposes of the ECOA is to promote equal and nondiscriminatory access to credit opportunity in a credit oriented society, extension of credit by a profit-making organization to persons otherwise disabled credit-wise, could constitute meeting a special social need through a special purpose credit program.'" (CITING 571 F.Supp. 551 (1982) at 560, UNITED STATES of America v. AMERICAN FUTURE SYSTEMS, INC., et al, Civ. A. No. 78-1517, United States District Court, E.D. Pennsylvania, 22 December 1982

G.) "The first pertinent requirement under § 202.8(a)(3) is that the 'special purpose credit program [is] offered by a for-profit organization or in which such an organization participates to meet special social needs.'" (CITING 571 F.Supp. 551 (1982) at 561, UNITED STATES of America v. AMERICAN FUTURE SYSTEMS, INC., et al, Civ. A. No. 78-1517, United States District Court, E.D. Pennsylvania, 22 December 1982

H.) "Section 202.8(a) provides that once the requirements necessary to address the particular social need are set, persons not within the special social need category may be excluded from participation in the particular credit program. It states:

> the Act and this part are not violated if a creditor refuses to extend credit to the applicant solely because the applicant does not qualify under the special requirements that define eligibility for the following types of special purpose credit programs." 12 C.F.R. § 202.8(a)

I.) "The second requirement under § 202.8(a)(3) is that the special purpose credit program be set out in writing.[5] ( Citing Footnote 5: 'The special purpose credit program must be established and administered pursuant to a written plan that (A)

identifies the class or classes of persons that the program is designed to benefit and (B) sets forth the procedures and standards for extending credit pursuant to the program.'") 12 C.F.R. § 202.8(a)(3)(i)

J.) "Congressman Annunzio, who recommended key amendments which broadened the types of discrimination prohibited by the ECOA, elaborated on the purpose of the ECOA:

> The essential concept of nondiscrimination in the extension of credit is that each individual has a right when he applies for credit, to be evaluated as an individual: to be evaluated on his individual creditworthiness, rather than based on some generalization or stereotype about people who are similar to him in race, color, national origin, religion, age, sex or marital status. *Bias is not creditworthiness. Impression is not creditworthiness. An individual's ability and willingness to repay an extension of credit is creditworthiness.* 121 Cong.Rec. 16,740 (1975) (emphasis added) The ECOA defines 'discriminate' as follows: '*Discriminate against an applicant* means to treat an applicant less favorably than other applicants.'" 12 C.F.R. § 202.2(n) (1984)

K.) "It is precisely for this reason that Regulation B states that a program may be considered a special purpose credit program 'only if it was established and is administered so as not to discriminate against an applicant on the basis of race, color, religion, national origin, sex, marital status, [or] age ... *except* that all program participants may be required to share one or more of those characteristics so long as the program was not established and is not administered with the purpose of evading the requirements of the Act or this part.' § 202.8(b)(2) The explanatory notes to the 1977 revision of Regulation B, § 202.8(b)(2), point out that

> 'once the characteristics of the class of beneficiaries are established, a creditor may not discriminate among potential beneficiaries on a prohibited basis. For example, a creditor might establish a credit program for impoverished American Indians. If the program met the requirements of § 202.8(a), the creditor could refuse credit to non-Indians *but could not discriminate among Indian applicants on the basis of sex or marital status.*'" 42 Fed.Reg. 1248 (1977) (emphasis added)

Both Beth and Diane were both illegally acting as an assignee of MEDC in October 2022 even though they weren't hired to make any credit decisions on behalf of MEDC. They both played no role in the credit decision making process but were allowed to answer the phone and discourage prospective applicants from applying for credit by denying that MEDC did not have on hand any grant or forgivable loans to extend to a qualified small business from the pool of economic resources that were delegated to MEDC in the amount of $5 million by the State of Wisconsin Department of Administration in April 2022. They were both acting in the illegal capacity denying credit to prospective applicants by discouraging those prospective applicants via a falsehood that MEDC did not have on hand any grants or forgivable loans to assist that small business to recover from the COVID-19 Pandemic. There is no question that by refusing to connect the call to a authorized loan officer who was actually authorized to make a credit decision on a credit application under the special purpose credit program established by the ARPA was an act of deception that discouraged a prospective applicant from being forwarded the credit application in question to be filled out by Vega Global Advisors to be later considered by the appropriate authorized loan officer or authorized underwriter at MEDC for a grant or forgivable loan.

292 F.Supp.2d 1181 (2003), Albert M. BAYARD, Plaintiff, v. BEHLMANN AUTOMOTIVE SERVICES, INC., et al., Defendants, No. 4:02 CV 01298 AGF, United States District Court, E.D. Missouri, Eastern Division, 7 November 2003

"The ECOA defines a 'creditor' as 'any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.' 15 U.S.C. § 1691a(e) Under this language, it appears that Behlmann would be considered a creditor as one who regularly arranges for the extension of credit. The regulations, however, define 'creditor' differently for different portions or purposes of the Act. The version of Regulation B in effect at the time of the transaction in this case defined 'creditor' as:

a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit.... For purposes of §§ 202.4 [prohibiting discrimination in credit decisions] and 202.5(a) [prohibiting discriminatory discouragement of applying for credit], the term also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers creditors to whom requests for credit may be made. 20 C.F.R. § 202.2(*l*) (Jan.2002)

Comment 2 to § 202.2(*l*) explained:

> For certain purposes, the term *creditor* includes persons such as real estate brokers who do not participate in credit decisions but who regularly refer applicants to creditors or who select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4, the general rule prohibiting discrimination, and with § 202.5(a), on discouraging applications. *Id.* Supp. I (Official Staff Interpretations)

Effective April 15, 2003, § 202.2(*l*) was revised in that the first sentence was changed to define creditor as 'a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit.' 68 Fed.Reg. 13144, 13155 (March 18, 2003). The comment to this new definition states as follows:

> For certain purposes, the term creditor includes persons such as real estate brokers, automobile dealers, home builders, and home-improvement contractors who do not participate in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4(a), the general rule prohibiting discrimination, and with § 202.4(b), the general rule against discouraging applications." 12 C.F.R. Pt. 202, Supp. I (March 2003)

Vega Global Advisors is authorized to bring a private cause of action under the ECOA against both LISC and MEDC based on the disparate treatment Vega Global Advisors was subjected to in September 2022 and October 2022 by being denied a grant or forgivable loan under the special purpose credit program established by the ARPA. Petitioner Vega has alleged that he was a member of a protected class, (a qualified small business in census tracts within 53202 and 53204) and that he was qualified for the grant and forgivable loan that he requested, (meeting the criteria within the Award Agreement between the State of Wisconsin Department of Administration and LISC or MEDC) and that the lender declined the loan and showed a preference for a non-protected individual.

310 F.Supp.2d 481 (2004), Tanya R. POWELL, Plaintiff, v. AMERICAN GENERAL FINANCE, INC., Beneficial, a.k.a. Household Finance Realty Corp., Inc., BSB Bank & Trust Co., Inc., NBT Bank, Charter One Bank, FSB, Citifinancial, Inc., HSBC Bank, Inc., and M & T Bank Corp., Inc., Defendants, No. 3:02-CV-1605, United States District Court, N.D. New York, 22 March 2004

"Regulation B, part of the ECOA, prohibits lenders from denying credit to individuals because of their race, color, religion, national origin, sex, marital status, or age. *See* 15 U.S.C. § 1691 *et seq.; see also* 12 C.F.R. § 202.1 (Omitting Citation 5) The ECOA provides for a private cause of action based on disparate impact or disparate treatment. *See Jones v. Ford Motor Credit Co.*, No. 00 CIV. 8330, 2002 WL 88431, *3 (S.D.N.Y. Jan. 22, 2002), *rev'd on other grounds,* 358 F.3d 205 (2d Cir.2004). Courts analyze disparate treatment claims under the ECOA in the same manner as Title VII employment cases. *See Gross v. United States Small Bus. Admin.,* 669 F.Supp. 50, 52 (N.D.N.Y.1987) (Citations Omitted). Therefore, to establish her claim, a plaintiff must allege that she was a member of a protected class, that she was qualified for the loan that she requested, and that the lender declined the loan and showed a preference for a non-protected individual. *See id.* To establish a *prima facie* case under a disparate impact theory, a plaintiff must identify a specific policy or practice which the defendant has used to discriminate and must also demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group." *See Jones,* 2002 WL 88431, at *3 (Citations Omitted)

MEDC based on the disparate treatment Vega Global Advisors was subjected to in September 2022 and October 2022 by being denied a grant or forgivable loan under the special purpose credit program established by the ARPA. Petitioner Vega is a qualified applicant because he represents Vega Global Advisors a corporation under 15 U.S.C. § 1691 a(f) that contains an Article of Organization along with company registration in the State of Florida. Vega Global Advisors is also a qualified applicant because the startup is "any person who is or may become contractually liable regarding an extension of credit........" Petitioner Vega has alleged that he was a member of a protected class, (a qualified small business in census tracts within 53202 and 53204) and that he was qualified for the grant and forgivable loan that he requested, (meeting the criteria within the Award Agreement between the State of Wisconsin Department of Administration and LISC or MEDC) and that the lender declined the loan and showed a preference for a non-protected individual. Both LISC and MEDC as creditors made oral statements, in advertising or otherwise, to Vega Global Advisors as a qualified applicant or qualified prospective applicant that discouraged on a prohibited basis a reasonable person from making or pursuing an application for credit in the form of a grant or forgivable loan within the special purpose credit program established by the ARPA (12 U.S.C. § 202.4(b))

TERRILAFONTAINE TORGERSON and BIG TALK, INC., a South Dakota corporation, Plaintiffs, v. WELLS FARGO BANK SOUTH DAKOTA, N.S., a corporation, Defendant, No. Civ 05-1050, United States District Court, D. South Dakota, Northern Division, 3 February 2009

A.) "The Equal Credit Opportunity Act ('ECOA') prohibits discrimination against any applicant for credit. 15 U.S.C. § 1691(a) Applicant includes a corporation. 15 U.S.C. § 1691 a(f) The term applicant also includes 'any person who is or may become

> contractually liable regarding an extension of credit... the term includes guarantors, sureties, endorsers, and similar parties.'" 12 C.F.R. § 202.2(e)

B.) "Under the ECOA, discrimination against an applicant means 'to treat an applicant less favorably than other applicants.' 12 C.F.R. § 202.2(n) To establish a prima facie case of lending discrimination under ECOA, Big Talk must show that

(1) plaintiff was a member of a protected class,
(2) plaintiff applied for and was qualified for a loan with the bank,
(3) the loan was rejected despite plaintiff's qualifications, and
(4) the bank continued to approve loans for applicants with similar qualifications." Rowe v. Union Planters Bank of Southeast Missouri. 289 F.3d 533, 535 (8th Cir. 2002) *See also* Oti Kaga. Inc. v. South Dakota Housing Development. 324 F.3d 871, 882-83 (8th Cir. 2003) (prima facie elements of a Federal Housing Act claim). "Implicit in the fourth element is the requirement that the non-members be similarly situated." Oti Kaga. 324 F.3d at 883

C.) "Finally, Regulation B of the ECOA provides not only that the creditor is prohibited from discriminating against an applicant, 12 U.S.C. § 202.4(a), but also prohibits discouragement:

A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application." 12 U.S.C. § 202.4(b)

Again both Beth and Diane were both illegally acting as an assignee for MEDC in October 2022 even though they weren't hired to make any credit decisions on behalf of MEDC. They both played no role in the credit decision making process but were allowed to play with the phones and discourage prospective applicants

extend to a qualified small business from the pool of economic resources that were delegated to MEDC in the amount of $5 million by the State of Wisconsin Department of Administration in April 2022. They were both acting in the illegal capacity denying credit to prospective applicants by discouraging Vega Global Advisors in the form of providing a falsehood that MEDC did not have on hand any grants or forgivable loans to assist that small business to recover from the COVID-19 Pandemic. There is no question that by refusing to connect the call to a loan officer who was actually authorized to make a credit decision on a credit application under the special purpose credit program established by the ARPA was an act of deception that discouraged a prospective applicant from being forwarded the credit application in question to be filled out by Vega Global Advisors to be considered by the appropriate loan officer or authorized underwriter at MEDC for a grant or forgivable loan. The same could be said for the conduct of Matt Melendes during the video call in September 2022 where Matt Melendes simply brushed aside the request for credit by Pablito Vega on behalf of Vega Global Advisors by instead recommending that Pablito Vega should seek out a venture capitalist. Matt Melendes purposefully did not disclose that LISC was in fact in possession of $3.3 million delegated to LISC by the State of Wisconsin Department of Administration in April 2022 to be dispersed in the form of a grant or forgivable loan to a qualified small business that had a legal presence in 53204. Additionally Matt Melendes kept that information to himself and at no time during the video call conversation ever offered to send a loan application to Pablito Vega so he could effectively be considered for a grant or forgivable loan. Matt Melendes as well was not an authorized loan officer in the employ of LISC in September 2022. He was also illegally acting as an assignee. Matt Melendes was made aware by Pablito Vega that he represented Vega Global Advisors in negotiating a grant or a forgivable loan. In this case the economic resources that can be categorized as a special purpose credit program established by the ARPA.

PATRICIA DIANE MEEKS, Plaintiff, v. MURPHY AUTO GROUP, INC. d/b/a TOYOTA OF WINTERHAVEN, Defendant, Case No. 8:09-cv-1050-T-TBM, United States District Court, M.D. Florida, Tampa Division, 15 December 2010

"The ECOA defines 'creditor' as 'any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.' 15 U.S.C. § 1691a(e) The concomitant regulation defines 'creditor' as 'a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, . . . who so participates. For purposes of § 202.4(a) and (b), the term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made. . . .' 12 C.F.R. § 202.2(*l*). Sections 202.4(a) and (b) prohibit the creditor from discriminating against a consumer in the credit decision and from discouraging the consumer from seeking to apply for credit. The Seventh Circuit has concluded under this regulatory definition, that one who regularly refers applicants to lenders is a 'creditor' under the Act only for purposes of the anti-discrimination and anti-discouragement provisions of §§ 202.4(a) and (b). *See Treadway*, 362 F.3d at 979 [13]

(Citing FOOTNOTE 13: "In so concluding, the court cited to the commentary on this provision by the Federal Reserve Board wherein it recognized 'that in the credit application process persons may play a variety of roles, from accepting applications through extending and denying credit. . . . For example, an automobile dealer may merely accept and refer applications, perform underwriting, and make a decision whether to extend credit. Where the automobile dealer only accepts applications for credit and refers those applications to *another* creditor who makes the credit decision— for example, where the dealer does not participate in setting the terms of the credit or making the credit decision— the dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B.'") *Treadway*, 362 F.3d at 979-80 (citing 68 Fed. Reg. at 13155 (Mar. 18, 2003)

One event occurred in September 2022 denying the grant or forgivable loan and the other event occurred in October 2022 denying the grant or forgivable loan. The two year statute of limitation would fall in September 2024 and October 2024. The complaint was filed on 12 October 2023 meeting both deadlines on the two year statute of limitations and of course meeting the five year deadline in Sept 2027 or Oct 2027.

RANDALL S. TODD, et al. Plaintiffs, V. BANK OF AMERICA, N.A., et al., Defendants, Case No. 2:12-cv-00995-MMD-GWF, United States District Court, D. Nevada, 5 November 2012

"Moreover, ECOA claims are barred by a two-year statute of limitations. *See* 15 U.S.C. § 1691e(f). The two-year period runs from the date in which Plaintiffs obtain their loan, which here was September 23, 2005. *See GreenPoint*, 633 F. Supp. 2d at 929. Plaintiffs do not demonstrate why equitable tolling should apply to this claim."

930 F.Supp.2d 871 (2013), Kevin HAUG, Plaintiff, v. PNC FINANCIAL SERVICES GROUP, INC., et al., Defendants, Case No. 1:12 CV 485, United States District Court, N.D. Ohio, Eastern Division, 12 March 2013

"By terms of Public Law 111-203, § 1085(7) enacted on July 21, 2010, Congress increased the limitations period for bringing an action under the ECOA from two years to five years.[26] Although PNC cites to the present five-year limitations period as governing in this matter,[27] that period did not take effect until July, 2010, and the two-year limitations period applied prior to claims accruing prior to that date.[28] In general, absent an express statement by Congress that an expansion of a limitations period should apply retroactively,[29] courts following the Supreme Court's holding in *Landgraf v. USI Film Products*[30] have uniformly concluded that newly enacted legislation that lengthens a statute of limitations does not apply retroactively to revive a claim that had expired under the prior limitations period.[31] Thus, any ECOA claim accruing before July 21, 2010, is subject to a two-year limitations period, not the subsequently enacted fiveyear period. *Mays* teaches, in conformity with other courts, that the ECOA limitations period begins to run at the time the violation occurs, not "at the time when the consequences of the action become painful."[32] Thus, where the alleged violation is a failure to provide notice within the required time, the claim accrues on the date the notice was due but not provided; the limitations period begins on that date.[33] Similarly, where the alleged violation is discrimination under the ECOA, the cause of action accrues when the loan application is initially denied.[34] That said, courts have recognized that the continuing violation doctrine may toll the statute of limitations in an ECOA case.[35] Under that doctrine, which the Supreme Court has developed for hostile work environment cases arising under Title VII,[36] a plaintiff who can show 'not only a longstanding, overarching policy of discrimination but also a specific, allegedly discriminatory act against her within the relevant limitations period' may be entitled to toll the limitations period.[37] But, it must be noted that the Sixth Circuit, which has not directly addressed the continuing violation doctrine in the context of the ECOA, has said that, 'courts have been extremely reluctant to apply [the continuing violation] doctrine outside of the context of Title VII.'[38] Moreover, although the Supreme Court has held that equitable tolling is 'not inapplicable in discrimination cases' like those filed under the ECOA, such a remedy is to be employed 'sparingly.'[39] To survive a motion to dismiss, an ECOA plaintiff must allege 'the minimum information necessary' to invoke equitable tolling.[40] The Supreme Court has held that equitable tolling is available when a plaintiff can show (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.[41]

[FOOTNOTE 27] *See,* ECF # 5 at 6
[FOOTNOTE 28] *Cottrell v. Vilsack,* 915 F.Supp.2d 81, 90 n. 7, 2013 WL 49569, at *7 n. 7 (D.D.C. Jan. 4, 2013)
[FOOTNOTE 29] *See also, id.* at n. 8. Prior to the 2010 extension of the limitations period, Congress in 1998 passed legislation reviving ECOA claims against the U.S. Department of Agriculture that were filed between 1981 and 1996 but had been barred by the two-year limitations period. This legislation created a window for farmers to refile the claims in federal court or seek review by the Department of Agriculture.
[FOOTNOTE 30] *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)
[FOOTNOTE 31] *In re ADC Telecomms., Inc. Secs. Litig.,* 409 F.3d 974, 977 (8th Cir.2005); *Enter. Mortgage Acceptance Co., LLC, Secs. Litig. v. Enter. Mortgage Acceptance Co.,* 391 F.3d 401, 409-10 (2d Cir.2004); *Chenault v. U.S. Postal Serv.,* 37 F.3d 535, 539 (9th Cir.1994)

(E.D.Tenn. Feb. 14, 2011)

[FOOTNOTE 33] *See, Moore,* 2011 WL 652844, at *4

[FOOTNOTE 34] *Haynie v. Veneman,* 272 F.Supp.2d 10 (D.D.C.2003)

[FOOTNOTE 35] *Claybrooks v. Primus Auto. Fin. Servs.,* 363 F.Supp.2d 969, 980-81 (M.D.Tenn.2005)

[FOOTNOTE 36] *See, AMTRAK v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)

[FOOTNOTE 37] *Claybrooks,* 363 F.Supp.2d at 983 (Citations Omitted)

[FOOTNOTE 38] *Bygrave v. Van Reken,* 238 F.3d 419, 2000 WL 1769587, at *2 n. 2 (6th Cir.2000) (quoting *LRL Props. v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1105 n. 3 (6th Cir.1995)); *see also, Ohio Midland Inc. v. Proctor,* 2006 WL 3827510, at *9 (S.D.Ohio Dec. 28, 2006)

[FOOTNOTE 39] *Hafiz v. Greenpoint Mortgage Funding,* 652 F.Supp.2d 1039, 1045 (N.D.Cal.2009) (citing and quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002))

[FOOTNOTE 40] *Hafiz,* 652 F.Supp.2d at 1045

[FOOTNOTE 41] *Lawrence v. Florida,* 549 U.S. 327, 335, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (citation omitted); accord, *Robinson v. Easterling,* 424 Fed.Appx. 439, 442 n. 1 (6th Cir.2011)

930 F.Supp.2d 871 (2013), Kevin HAUG, Plaintiff, v. PNC FINANCIAL SERVICES GROUP, INC., et al., Defendants, Case No. 1:12 CV 485, United States District Court, N.D. Ohio, Eastern Division, 12 March 2013

"As noted, a cause of action for failure to provide the notice required by the ECOA accrues at the time the violation occurs. Since the date notice was required for an application submitted on December 22, 2005, was January 21, 2006, and the present action was not filed until February 29, 2012—or more than four years after the expiration of the two-year limitations period in effect at that time, both counts one and two are time-barred, absent equitable tolling or other relief from operation of the limitations period."

754 F.3d 380 (2014), RL BB ACQUISITION, LLC, Plaintiff-Appellee, v. BRIDGEMILL COMMONS DEVELOPMENT GROUP, LLC, et al., Defendants, Starr Stone Dixon, Defendant-Appellant, No. 13-6034, United States Court of Appeals, Sixth Circuit, Argued: March 14, 2014, Decided and Filed: June 12, 2014

"A creditor who violates Regulation B necessarily violates ECOA itself. *See* 15 U.S.C. § 1691a(g). An applicant harmed by the creditor's violation of Regulation B has the full range of ECOA remedies available to her. *See* 12 C.F.R. § 202.16(b), 12 C.F.R. § 1002.16(b). If a guarantor discovers a violation of the spouse-guarantor rule, she is free to bring an independent lawsuit (or a counterclaim) within ECOA's statute of limitations." [4]

FOOTNOTE 4: "When Starr executed her guaranty in June 2008, the statute of limitations for ECOA violations was two years. *See Mays v. Buckeye Rural Elec. Coop.,* 277 F.3d 873, 879 (6th Cir.2002). The Dodd-Frank Act subsequently extended the limitations period to five years. *See* Pub.L. No. 111-203, § 1085(7), 124 Stat. 1376, 2085 (2010) (codified at 15 U.S.C. § 1691e(f)); *see also* 12 C.F.R. § 1002.16(b)(2). Starr first raised her ECOA defense in December 2011; however, she has not attempted to take advantage of the five-year statute of limitations."

In re: VAN E. JOHNSON, Chapter 13, Debtor, VAN E. JOHNSON Plaintiff, v. WELLS FARGO BANK, N.A. d/b/a AMERICA'S SERVICING COMPANY, BANK OF AMERICA, NATIONAL ASSOCIATION as Trustee for MORGAN STANLEY TRUST 2006-6AR, MORGAN STANLEY CAPITAL 1 INC., A DELAWARE CORPORATION, as Depositor, MORGAN STANLEY & CO. as Underwriter, MORGAN STANLEY MORTGAGE CAPITAL INC., as Seller, IDEAL MORTGAGE BANKERS d/b/a LEND AMERICA, KR MANAGEMENT LLC & MALCO REAL ESTATE INC., and JOHN AND JANE DOES 1 THROUGH 10, Defendants, Case No. 09-49420, Adv. Pro. No. 13-01445, United States Bankruptcy Court, E.D. New York, August 22, 2014

A.) "The ECOA prohibits creditors from discriminating 'against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age. . . .' 15 U.S.C. § 1691. The statute provides a private right of action, and successful plaintiffs may recover actual and punitive damages, equitable and declaratory relief, and court costs and attorney's fees. 15 U.S.C. § 1691e(a)-(d). The original version of the ECOA passed in 1974 prohibited discrimination in the granting of credit on the basis of sex or marital status only. *See* Richard M. Alderman and Dee Pridgen,

discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit.' *Anderson v. United Fin. Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982). In 1976, the ECOA was expanded to ban discrimination on the basis of race, color, religion, national origin, and age."

B.) "At the time that Johnson entered into his home loan and mortgage, the ECOA provided that a claim for relief had to be brought within two years after the date that the discriminatory credit practice occurred.[5] 15 U.S.C. § 1691e(f). As with FHA claims, direct evidence of invidious discrimination can be hard to uncover, and the limitations period may not begin to run until the plaintiff knows or reasonably should know that a violation has occurred."

FOOTNOTE 5: "The statute of limitations for a claim under the ECOA was extended from two to five years in July 2010 by the Dodd-Frank Wall Street Reform and Consumer Protection Act. That amendment is not applicable to Johnson's claims. *See Cottrell v. Vilsack*, 915 F. Supp. 2d 81, 90 & n.7 (D.D.C. 2013) (noting that the applicable statute of limitations under the ECOA was two years at the time of the claim); *Citgo Petroleum Corp. v. Bulk Petroleum Corp.*, 2010 U.S. Dist. LEXIS 82277, at *8 n.4 (N.D. Okla. Aug. 12, 2010) (holding that the Dodd-Frank extension did not apply retroactively)."

Vega Global Advisors is a private startup that meets the qualifications of a small business that has a legal presence in various census tracts in Zip Code 53202 and Zip Code 53204 as defined by the terms and conditions of the Award Agreement between the Wisconsin Department of Administration and both entities, one the LISC and the other the MEDC, classified as Community Development Financial Institutions that were awarded between them $8.3 million to assist small businesses in recovering from the COVID-19 Pandemic via the disbursement of grants and forgivable loans made possible by this special purpose credit program established through the ARPA. Vega Global Advisors made several appeals and requests to both of these Community Development Financial Institutions in September 2022 and October 2022 but was refused by staffers not authorized to make credit decisions on behalf of those organizations. Instead Vega Global Advisors was prevented from speaking to the appropriate loan officer that had the authority to make credit decisions. Vega Global Advisors was an applicant at that time but was refused the actual credit application by staffers that had no authority to make credit decisions. Instead they acted as screeners of phone calls and ideological blockers discouraging Vega Global Advisors from filling out the actual credit application by refusing to acknowledge that in fact their organizations were the actual beneficiaries of $8.3 million in special purpose credit program economic resources designed to assist small businesses recover from the COVID-19 Pandemic with the utilization of a grant of forgivable loan.

TINA ALEXANDER; SHEILA ALEXIS; EVELYN BAINES; SHAUNTAY BENNINGS; NYO HAYGOOD; TABITHA HENRY; CHEYANNE JONES; ROSLYN JONES; KENDRA WILLIAMS; KYSHIA WOODS; ZACHARY BAYLOR; TRACEY KENNERLY, Plaintiffs-Appellants, v. AMERIPRO FUNDING, INCORPORATED; AMEGY BANK NATIONAL ASSOCIATION; WELLS FARGO BANK, N.A., Defendants-Appellees, No. 15-20710, United States Court of Appeals, Fifth Circuit, Filed February 16, 2017

A.) "To state a claim for relief under the ECOA, the plaintiffs must plausibly show that they were discriminated against in violation of the statute. More specifically, the complaint must plausibly allege that (1) each plaintiff was an 'applicant'; (2) the defendant was a 'creditor'; and (3) the defendant discriminated against the plaintiff with respect to any aspect of a credit transaction on the basis of the plaintiff's membership in a protected class. *See* 15 U.S.C. §§ 1691(a), 1691a(b), 1691a(e), 1691e(a).[7] B.) "As we have earlier noted, the ECOA provides that '[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . because all or part of the applicant's income derives from any public assistance program.' 15 U.S.C. § 1691(a)(2). One remedy for such discrimination is a civil cause of action, providing that '[a]ny creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant.' 15 U.S.C. § 1691e(a) (emphasis added). 'Applicant' is defined as 'any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit.' 15 U.S.C. § 1691a(b).[8] 'There is nothing ambiguous about "applicant."'

Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co., LLC, 476 F.3d 436, 441 (7th Cir. 2007). 'To "apply" means "to make an appeal or request especially formally and often in writing and usually for something of benefit to oneself." Thus, the plain language of the ECOA unmistakably provides that a person is an applicant only if she requests credit.' Hawkins v. Cmty. Bank of Raymore, 761 F.3d 937, 941 (8th Cir. 2014) (citing Webster's Third New International Dictionary 105 (2002)) (alterations omitted), aff'd by an equally divided Court, 136 S. Ct. 1072 (2016).[9]

C.) "Plaintiffs also counter that even if they did not actually apply, they failed to apply only because they were 'discouraged' from applying. It is true that a regulation pertinent to the ECOA, known as 'Regulation B,' provides that '[a] creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.' 12 C.F.R. § 202.4(b). But § 202.4(b) does not alter the definition of 'applicant,' and only an 'aggrieved applicant' has standing under the ECOA to bring a private cause of action. 15 U.S.C. § 1691e. The statute provides no cause of action for an 'aggrieved prospective applicant.' Discouragement of a 'prospective applicant' may be regulatorily prohibited, but it cannot form the basis of a private claim or cause of action under the ECOA." [11]

D.) "The Consumer Financial Protection Bureau ('CFPB'), as amicus, argues that the ECOA's and Regulation B's definitions of 'creditor' are broad enough to encompass Wells Fargo's conduct. See 12 C.F.R. § 202.2(l) ('Creditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee, or subrogee who so participates.'); 12 C.F.R. Pt. 1002, Supp. I ¶ 1002.2(l)(1), 76 Fed. Reg. 79,442, 79,473 (2011) ('The term creditor includes all persons participating in the credit decision. This may include an assignee or a potential purchaser of the obligation who influences the credit decision by indicating whether or not it will purchase the obligation if the transaction is consummated.'). But even Regulation B's definition of 'creditor' does not purport to extend to those who have no direct involvement whatsoever in an individual credit decision. See 68 Fed. Reg. 13,144, 13,145 (2003) ('The final rule clarifies that the definition of creditor includes those who make the decision to deny or extend credit, as well as those who negotiate and set the terms of the credit with the consumer. But a potential assignee who establishes underwriting guidelines for its purchases but does not influence individual credit decisions is *not* a creditor.') (emphasis added);[14] accord In re Simmerman, 463 B.R. 47, 63 (Bankr. S.D. Ohio 2011) ('[A]n assignee may only be held liable as a "creditor" when the assignee influences the credit decision by, for example, participating in the decision to extend credit or by negotiating the terms of the credit. Without being involved in or influencing the credit decision, the assignee will not be held liable as a creditor under the ECOA.')."

[7] "Accord Estate of Davis v. Wells Fargo Bank, 633 F.3d 529, 538 (7th Cir. 2011) ('To state a claim under the ECOA, Mrs. Davis had to allege that she was an "applicant" and that the defendants treated her less favorably because of her race.')."
[8] "Further, 'creditor' is defined as 'any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.'" 15 U.S.C. § 1691a(e)
[9] "Some courts have found that 'applicant' is ambiguous with respect to whether the term covers a guarantor. See, e.g., RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC, 754 F.3d 380, 384-85 (6th Cir. 2014). We need not decide whether the term includes a guarantor, or whether we ought to defer to Regulation B's definition of the term, which, unlike the statute, explicitly includes guarantors, and which, unlike the statute, includes those who 'request[ ]' credit. See 12 C.F.R. § 202.2(e). We are satisfied that the term 'applicant' does not include individuals who are not guarantors and who never request credit at all."
[11] "Administrative agencies have broader enforcement powers under the ECOA than individuals attempting to bring a private cause of action." See 15 U.S.C. §§ 1691c, 1691e
[14] "The 2011 guidelines, though arguably broader than the 2003 guidelines, were careful to note that 'this interim final rule does not impose any new substantive obligations on regulated entities.'" 76 Fed. Reg. at 79,442

Both respondents LISC and MEDC are classified as Community Development Financial Institutions by the State of Wisconsin that are in the business of offering credit in the course of their day-to-day activities along with participating in those credit decisions and establishing the terms on which the credit will be extended to consumers requesting credit of some sort. Vega Global Advisors is an applicant for that credit under the special purpose credit program established by the ARPA administered by the State of Wisconsin Department of Administration delegated to the LISC and MEDC in the amount of $8.3 million to assist small

Global Advisors requested this credit but was denied for the credit in question even though Vega Global Advisors was authorized to become contractually liable regarding the credit in question as a qualified small business meeting all the criteria in the Award Agreement between the State of Wisconsin Department of Administration and the two Community Development Financial Institutions that were the recipients of $8.3 million in a special purpose credit program designed to assist small businesses in the recovery efforts from the COVID-19 Pandemic located within certain census tracts in Zip Code 53202 and Zip Code 53204 in the form of a grant or forgivable loan.

CARLOS ALEXIS MARTINEZ GARCIA, Plaintiff, v. MEGA AUTO OUTLET, et al., Defendants, Civil Action No. 1:20-cv-945 (LO/TCB), United States District Court, E.D. Virginia, Alexandria Division, February 23, 2021

*A.) "First,* Defendant is a creditor. The ECOA regulations define 'creditor' as an entity that 'in the ordinary course of business, regularly participates in a credit decision, including setting the terms on the credit.'" 12 C.F.R. § 202.2(l)
*B.) "Second,* Plaintiff is an applicant who submitted an application for credit. Plaintiff is an applicant because he was a 'person who request[ed] or who [received] an extension of credit from a creditor' and is 'a person who is or may become contractually liable regarding the extension of credit.'" 12 C.F.R. § 202.2(e)

Vega Global Advisors is authorized to bring a private right of action as either a 'prospective applicant' or as an 'actual applicant' under ECOA. Vega Global Advisors was prevented from submitting a credit application to both the LISC & MEDC by staffers acting illegally as assignees and therefore, Pablito Vega can be considered an 'aggrieved applicant.' The loan request was turned down on the spot because these staffers did not believe that Pablito Vega was in fact affiliated with a private startup that met all the qualifications under the Award Agreement between the State of Wisconsin Department of Administration and both of these Community Development Financial Institutions. They thought that Pablito Vega was simply some consumer that was under-employed as a result of the COVID-19 Pandemic. They did not believe that Pablito Vega has a private family office in Wisconsin or a private family office in Florida. They did not believe that Pablito Vega manages a private startup. They did not believe that Pablito Vega was a professional independent contractor affiliated with a private startup that provides cloud computing solutions to a predetermined private client base in his role as a quantitative analyst. Vega Global Advisors is authorized under section 1691e of the ECOA that created a private right of action for Pablito Vega to bring this cause of action against LISC and MEDC because, 'any creditor who fails to comply with any requirement imposed by this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting in an individual capacity....' 15 U.S.C. § 1691e(a) Pablito Vega was an 'applicant' because he was 'any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit.' 15 U.S.C. § 1691a(b). 'The plain language of the ECOA unmistakably provides that a person is an applicant only if he requests credit.' Pablito Vega during these phone conversations with these staffers at LISC and MEDC in September 2022 and October 2022 repeatedly requested a credit application but was constantly refused to be provided one on the spot. Instead Pablito Vega was sold the idea by these staffers acting illegally as assignees of LISC and MEDC that both organizations did not have on hand any grants or forgivable loans to extend to a small business. These staffers conscientiously refused to disclose that both organizations were the actual beneficiaries in the amount of $8.3 million delegated to them by the State of Wisconsin Department of Administration to assist

loan. Pablito Vega's argument is that he was discouraged from 'applying for credit' by both LISC and MEDC. His complaint is clear that Pablito Vega was prevented by LISC and MEDC from applying for credit on a loan by staffers illegally acting as assignee of both organizations. When in fact they were not hired as loan officers or underwriters or anything else that delegated to them the responsibility to decide credit matters on behalf of the Community Development Financial Institution. Pablito Vega was thus rendered an obviously aggrieved applicant. "Only an 'aggrieved applicant' has standing under the ECOA to bring a private cause of action." Pablito Vega was obviously a victim of discouragement at the hands of staff illegally acting as assignees of both organizations in September 2022 and October 2022 as a prospective applicant requesting constantly for a credit application to be tender to him so he could be considered for a grant or for a forgivable loan under the special purpose credit program established by the State of Wisconsin Department of Administration utilizing economic resources derived from the ARPA. Instead, Pablito Vega was denied access to that credit by these staffers refusing to connect the call with an authorized loan officer at LISC and MEDC.

ELIJAH WILSON, et al., Plaintiffs, v. COMMUNITY POWERED FEDERAL CREDIT UNION, et al., Defendants, Civil Action No. 20-1258-RGA, United States District Court, D. Delaware, August 19, 2021

"Defendants argue that dismissal is appropriate because there is no private right of action for 'prospective applicants' under ECOA. Wilson contends that he submitted an application and, therefore, is considered an 'aggrieved applicant.' He implies that the loan request was turned down because of his race.[2] He also argues he has a private right of action because he sought pre-qualification as part of the credit transaction. Section 1691e of the ECOA creates a private right of action for individuals and provides, 'Any creditor who fails to comply with any requirement imposed by this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting [] in an individual capacity....' 15 U.S.C. § 1691e(a) The ECOA defines 'applicant' as 'any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit.' 15 U.S.C. § 1691a(b). 'The plain language of the ECOA unmistakably provides that a person is an applicant only if []he requests credit.' *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 941 (8th Cir. 2014) (quotation marks and citation omitted), *aff'd per curiam by an equally divided Court*, 577 U.S. 495 (2016) Wilson's arguments do not square with the Complaint's allegations that he was discouraged from 'applying for credit' and that he 'wanted to apply for' a loan. (D.I. 1 at ¶¶ 13, 15). In other words, the Complaint is clear that Plaintiff did not apply for credit or a loan. As alleged, Wilson is not entitled to relief under the ECOA because he never applied for credit. The failure to allege that he was an applicant is fatal to his claim. '[O]nly an "aggrieved applicant" has standing under the ECOA to bring a private cause of action. The statute provides no cause of action for an "aggrieved prospective applicant." Discouragement of a "prospective applicant" may be regulatorily prohibited, but it cannot form the basis of a private claim or cause of action under the ECOA.' *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 708 (5th Cir. 2017) (citing 15 U.S.C. § 1691e). Wilson was never an applicant for credit and does not have a private right of action under the ECOA. Wilson argues that he was in 'pre-qualification' and that this part of the credit procedures is an aspect of a credit transaction subject to a private right of action under the C.F.R. and the ECOA statute. Granted, 12 C.F.R. § 1002.4(b), promulgated by the Consumer Financial Protection Bureau (CFPB) pursuant to the ECOA, prohibits a creditor from making any statement 'to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.' Pre-qualification status, however, does not suffice to state a claim. First, § 1002.4(b) does not change the definition of 'applicant,' let alone expand the definition to include 'prospective applicant'; on the contrary, the use of the disjunctive 'or' in § 1002.4(b) makes clear that the CFPB draws a distinction between 'applicants' and 'prospective applicants.' Second, the ECOA vested the CFPB with enforcement powers that are more expansive than the private right of action authorized by § 1691e(a). Thus, it makes sense that the CFPB would promulgate regulations that extend to parties not covered by the ECOA's private right of action. Third, even if § 1002.4(b) could somehow be read as evidence that the CFPB intended to expand the definition of 'applicant,' courts only defer to an agency's interpretation of a statute when the text of the statute is ambiguous. 'If the intent of Congress is clear, that is

applicants, a cause of action for prospective applicants 'does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.' In this case, the text of the ECOA is unmistakably clear that only applicants are covered by its private right of action." *Dhade v. Huntington Learning Ctr.*, 414 F. Supp. 3d 703, 707 (D. Del. 2019) (internal quotations and citations omitted).

FOOTNOTE 2: "Wilson's opposition contains facts that are not in his Complaint. Wilson may not amend his complaint through his opposition brief, and these new facts may not be considered by the Court on the instant motion to dismiss. *See Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)) ('[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.')."

Both LISC and MEDC violated Regulation B's long standing discouragement prohibition by refusing to connect the calls to an authorized loan officer employed for LISC and MEDC in September 2022 and October 2022 to allow Pablito Vega access to a credit application to have been filled out and signed and submitted on that same day to the loan officer in question authorized to make credit decisions on credit application for either a grant or favorable loan sponsored by the special purpose credit program created by the State of Wisconsin Department of Administration from the economic resources allocated to said by the ARPA. Several federal courts have consistently recognized Regulation B's discouragement prohibition, even when applied to prospective applicants. (Citing *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698 (5th Cir. 2017); *Dhade v. Huntington Learning Centers, Inc.*, 414 F. Supp. 3d 703 (D. Del. 2019); *Page v. Midland Fed. Sav. & Loan Ass'n*, 2013 WL 5211747, at *5 (N.D. Ill. Sept. 13, 2013))

Pablito Vega meets the ECOA's definition of 'applicant,' because he requested credit but was refused by staffers at the LISC and MEDC acting illegally as assignees of both organizations. The plain language of the ECOA unmistakably provides that a person is an applicant only if she or he requests credit. (Citing 15 U.S.C. § 1691a(b); Webster's Third New International Dictionary 105 (2002)) Pablito Vega certainly enjoys to pursue a private right of action as a private prospective applicant under Section 1691e.

BUREAU OF CONSUMER FINANCIAL PROTECTION, Plaintiff, v. TOWNSTONE FINANCIAL, INC. and BARRY STURNER, Defendants, No. 20-cv-4176, United States District Court, N.D. Illinois, Eastern Division, 3 February 2023

A.) "The CFPB responds that Regulation B's longstanding discouragement prohibition is authorized by and necessary to the ECOA, and that courts have consistently recognized Regulation B's discouragement prohibition, even when applied to prospective applicants." R. 35, Resp. at 8-10 (citing *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698 (5th Cir. 2017); *Dhade v. Huntington Learning Centers, Inc.*, 414 F. Supp. 3d 703 (D. Del. 2019); *Page v. Midland Fed. Sav. & Loan Ass'n*, 2013 WL 5211747, at *5 (N.D. Ill. Sept. 13, 2013))

B.) ".......the Eighth Circuit found that the 'text of the ECOA clearly provides that a person does not qualify as an applicant under the statute solely by virtue of executing a guaranty to secure the debt of another.' *Id.* at 941 The court looked to the ECOA's definition of 'applicant,' reviewed the dictionary definition for 'apply,' and concluded that 'the plain language of the ECOA unmistakably provides that a person is an applicant only if she requests credit.'" *Id* (citing 15 U.S.C. § 1691a(b); Webster's Third New International Dictionary 105 (2002))

C.) "The Court's reading of the ECOA, moreover, is not limited to the civil liability section of the ECOA, which provides that '[a]ny creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.' 15 U.S.C. § 1691e(a).[8] That is, the Court is not looking exclusively at the private right of action section of the ECOA to conclude that the whole act applies only to those who qualify as proper plaintiffs under that section. While this case may not present the specific issue of whether a private right of action exists for a private prospective applicant under Section 1691e........"

Footnote 8: "By contrast, the holding in one of the cases relied on by the CFPB, *Alexander v. AmeriPro Funding, Inc.,* 848 F.3d 698 (5th Cir. 2017), was limited to the court's interpretation of the civil liability section, Section 1691e. There, the court found, without applying the *Chevron* framework, that '[d]iscouragement of a "prospective applicant" may be regulatorily prohibited, but it cannot form the basis of a private claim or cause of action under the ECOA.' *Id.* at 708. The Court finds *Alexander* of limited utility because the court did not address whether the court should defer to Regulation B under the two-step *Chevron* framework. Similarly, in *Dhade,* 414 F. Supp. 3d at 707, another case relied on by the CFPB limited to a claim brought under the civil liability section, the court found that Regulation B did not expand the definition of 'applicant' to include 'prospective applicant' in Section 1691e. Although the court noted that 'the ECOA vested the CFPB with enforcement powers that are more expansive than the private right of action,' it also applied *Chevron* step one to find that '[t]here is nothing ambiguous about "applicant,"' meaning the court should not defer to an agency's interpretation of the statute." *Id.* at 706-07

D,) "To further rebut Defendants' authority, the CFPB cites to cases which purportedly acknowledge and treat Regulation B's discouragement of prospective applicants as presumptively valid." Resp. at 9-10 (citing *Treadway,* 362 F.3d at 979-80; *Harbaugh v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.,* 615 F.2d 1169, 1174 (7th Cir. 1980))

E.) "The CFPB points to *Page,* 2013 WL 5211747, at *5, in which the court rejected Defendant's argument that the individual plaintiff's claim under the civil liability provision failed because she never submitted an application. The court looked to Regulation B's language and found that 'the ECOA applies to all stages of a credit transaction.'" *Id*

Therefore, the Petitioner Pablito Vega ask the Court to order Judgement against both entities to release to him a grant in the amount of $200,000 each and to compensate for the fraudulent acts committed against him another sum as punitive compensation for the fraudulent act of denying him the resource in question in the first instance in the amount of another $200,000 each. A total of $800,000.

## NOTICE OF SERVICE & PROOF OF FILING

Sob juramento de lei, Pablito Vega, que sos es uno de los Europello más marravillozzo de tododeis de los Europellos y jura que a sua declaração está correta e não diz mais nada sobre a seguinte pergunta de oz Santos Europellos en vosotros cielo gloriozzo de oz Europello mas pode rozzo des di Saa-Maria y Judia y les pedodeis a la Europella toda pode rozza en vosotros cielo gloriozzo Santa Cecilia de los Santos proteccioneis contrais el enfermo enemigo de la santa paz y tranquilidad. Please take notice that on 19 DEC 2023 Pablito Vega deposited into the USPS the attached Motion to be filed with the Clerk of the US District Court at Wisconsin Eastern District Milwaukee Division, so that the Motion will be uploaded via the E-MACS Pacer Platform associating it with 23-CV-1357. Pablito Vega certifies under the penalty of perjury and criminal liability that a copy of this Notice of Filing along with the Motion will be served upon the parties listed below.

| | |
|---|---|
| C.D.F.I. | PABLITO VEGA |
| Office of Legal Counsel | VEGA GLOBAL ADVISORS |
| MEDC Milwaukee Office | Mid-West Office |
| 757 North Broadway Avenue | Lobby Suite |
| Suite 600 | 1314 SOUTH FIRST STREET |
| Milwaukee, WI 53202 | MILWAUKEE, WI 53204 |
| Phone: 414 269-1440 | 1.609.874.9129 PHNE |
| Fax: 414 269-1466 | 1.248.748.2576 FAX |

*Pablito Vega* 19 DEC 2023
PABLITO VEGA                              DATE

**MEDCs Incorrect Assertions Regarding Disbursement of $8.3 Million to LISC & MEDC Per Appropriate Use In Re: Guidelines of Grants or Forgivable Loans Under ARPA**

Both Respondents should provide to the Court of their free will the names and identities of the small businesses in Wisconsin that were awarded a sum of some sort from the $8.3 million allocated to MEDC & LISC along with the dollar amount since April 2022. Otherwise, the Petitioner Vega will simply Subpoena these records for the edification of the Court as another manner to ascertain who were the actual beneficiaries putting into use these economic resources to achieve a particular organizational goal in either meeting Payroll or meeting a Mortgage Obligation. During both conversations that took place with these Respondents in September 2022 and October 2022 Pablito Vega was prevented from accessing the actual loan application by the staffers in question refusing to connect his call to an actual authorized Loan Officer that had the authority to transmit the loan application to Petitioner Vega. Pablito Vega was not allowed to fill out the loan application for either a Grant or Forgivable Loan by being prevented access to the Loan Officer in question authorized to make those decisions. Instead Petitioner Vega was sold the argument by these staffers that in September 2022 and October 2022 that these organizations did not have on hand any Grants or Forgivable loans to disperse to a small business in the Milwaukee SMSA within Zip Codes 53202 and 53204, when the truth of the matter was that just five to six months earlier in April 2022 both Respondents were allocated $8.3 million from the Wisconsin Department of Administration to disperse to qualified small businesses that met all of the qualifying conditions within the Award Agreement within the Wisconsin Department of Administration and both of these Respondents. What actually took place during these phone conversations was simply a deceptive denial that there did not exist a transfer of these economic resources in April 2022 to them because at no time during the actual conversation in question did either Respondent acknowledge having on hand for the past six months $8.3M allocated to them to be eventually dispersed to a small business seeking assistance to recover from the COVID-19 Pandemic. And no time during the conversation with the Respondent MEDC by either staffer who picked up the phone and refused to connect the call to an authorized Loan Officer was Petitioner Vega advised that MEDC was waiting on specific guidance on how it was to disburse these Grants from the Wisconsin Department of Administration and that it was forseen or expected in January 2023 for this guidance to materialize. And neither was Petitioner Vega called back in JAN 2023 with an offer to fill out the Forgivable Loan or Grant applications. Petitioner Vega was in fact an applicant under 15 U.S.C.A. § 1691 because his phone calls weren't meant to solicit information from both Respondents pertaining to any particular program they may or may not have had in 2022. Petitioner Vega's phone calls were meant to access a Grant or Forgivable Loan application from an authorized Loan Officer that was managing the Diverse Business Initiative Grant Program. Further nowhere within any of the clauses of the Award Agreement between the Wisconsin Department of Administration and MEDC is there any authorization restricting the granting of either a Forgivable Loan or Grant to only such person identified in 15 USCA § 1691(c)1. Nor was there any clause created in the ARPA also calling for that restriction when taking into account the awarding of a Forgivable Loan or Grant to assist the small business in question to recover from the COVID-19 Pandemic. 15 USCA § 1691(c)3 would defeat the purpose of any small business to recover from the COVID-19 Pandemic by a creditor refusing that small business access to "any special purpose credit program offered by a profit-making organization to meet special social needs which meets standards prescribed in regulations by the Bureau." The Petitioner Vega was also an applicant according to the definition contained in 12 C.F.R. § 202.2 because he repeatedly made various requests to be connected to a Loan Officer to fill out a Grant of Forgivable Loan application which he was denied access to after requesting several times to have access to it via an authorized Loan Officer that had the authority to forward to Petitioner Vega the Grant of Forgivable Loan application on that day in question in September 2022 and October 2022. Petitioner Vega did not formally submit a grant application to MEDC because he was denied that grant application. So it is not possible to submit an application that was refused to him. Petitioner Vega would have wasted his time repeatedly calling MEDC and having the phones answered by these two same individuals who repeatedly refuse to transfer his call to an authorized Loan Officer, Per his Complaint, Mr. Vega made two phone calls and was constantly lied to by being sold the argument that MEDC was not in receipt since April 2022 of the lump sum in question that was allocated to it for the purpose of administering Forgivable Loans and Grants from the Wisconsin Department of Administration Diverse Business Investment Grant Program. Petitioner Vega was effectively denied to apply for the credit. Petitioner Vega did not call these two MEDC employees of his with

them any knowledge of where his income was derived from. Rather he was lied to by those two same MEDC employees in Fall 2022 by being told MEDC was not in possession of Grants or Forgivable Loans to revitalize shuttered businesses in the Milwaukee area when in fact MEDC was dispersed the economic resources to convert into Forgivable Loans and Grants in April 2022. And if Petitioner Vega missed any deadline to fill out a loan application for a Grant of Forgivable Loan that was the fault of MEDC by selling him the argument that MEDC was not in possession of any economic resource to convert into a Forgivable Loan or Grant in Fall 2022 when in fact MEDC had already received the economic resources back in April 2022. And of course MEDC never returned any phone call from Fall 2022 to December 2023 advising Petitioner Vega that he was welcome to fill out a loan application for a Grant or Forgivable Loan whether or not to revitalize a shuttered property in the Milwaukee SMSA or to dedicate those funds that derived from a Special Purpose Credit Program created by the ARPA to fully operationalize VGAs ability to function at 100% after almost being driven out of business by the COVID-19 Pandemic. Apparently no one at MEDC understands that Person A does that have to be employed for either the Pritzker Organization or the Spitzer Organization to know that rehabilitating any property would entail cost associated with rent or mortgage payments and payroll. Aside from other costs such as insurance or for the vast hidden costs that are associated with rehabilitating any property in the process of the small business in question to solidify it's operational capacities such as those cost as rental or mortgage payments would play a role in that effort not counting the payroll cost associated with any effort to measure that endeavor. The Diverse Business Initiative Grant program was created to assist an economically disadvantaged class of businesses that were either put out of business or partially cripple by the COVID-19 Pandemic. Vega Global Advsiors did fit into the class outlined in the program guidelines because he was seeking a Forgibalbe Loan or Grant to "revitalize a shuttered property in Milwaukee." The Wisconsin Department of Administration required any grants from this program to be used for specific purposes, including, cost of rent or principal/interest for building mortgage, utilities, and payroll. Revitalizing a shuttered property in any market is an obvious stated purposes for which the funds could be allocated. MEDC does not understand that 15 U.S.C.A. § 1691(c)(3) would simply defeat the purpose of a Special Purpose Credit Program created by the ARPA to assist a small business in recovering from the COVID-19 Pandemic because it would in affect decline to meet the special social needs of that particular small business. Vega Global Advisers was prevented from applying for a Grant or Forgivable Loan under the Diverse Business Initiative Grants program, a Special Purpose Credit Program designed to assist small business recover from the COVID-19 Pandemic. The purported denial was not based on any deadline having passed to apply for the Diverse Business Initiative Grants Program but rather being prevented by those two staffers who constantly picked up the phone and blocked Pablito Vega from speaking with an authorized loan officer who would have forward to him the actual loan application to be filled out and submitted on that day in Fall 2022 whether or not the Wisconsin Department of Administration had yet to issue any particular guidelines prior to 10 January 2023. The Diverse Business Initiative Grant Program was created as a Special Purpose Credit Program designed to assist small businesses recover from the COVID-19 Pandemic and not a program to serve as a handout to racial minority groups who at no time ever create or build a business from nothing but who have historically sought shelter with a NPO, the economically disadvantaged class of persons under 15 U.S.C.A. § 1691(c)(1) MEDC mentions. Plus any small business that has an effective working relationship with their primary financial institution would have been the beneficiary of specific financing that would have addressed the special needs of that small business and would have no need to seek out a Grant or Forgivable Loan from any source because it would have survived the COVID-19 Pandemic in good standing. Racial minority group members who have been historically disadvantaged do not normally own a business because they lack the intellectual sophistication in managing a budget, operating a business, or do not understand markets, do not understand IT Systems, etc. And that is the reason these historically disadvantaged minority groups turn to the world of the NPOs. How many small businesses that are owned by a member of a historically disadvantaged minority group exist in Zip Code 53202 and Zip Code 53204 that managed to survive the COVID-19 Pandemic? How many small businesses are owned by a member of a historically disadvantaged minority group but who also are employed for a unit of government with the grace of Affirmative Action exist in the Milwaukee SMSA that managed to survive the COVID-19 Pandemic?